Was the prosecutor going to argue the amount of police step forward and state your names for the record? Morning Your Honor, this is Michael Rasak on behalf of the plaintiff appellants, Mies Holley. Don Singleton on behalf of the defendant BG Staffing and Willisha Hampton. Betsy Grover on behalf of the JRK Defendants, Timberwood Property Owners, and Nicole Norman who is the property manager. Okay, and have you talked about how you want to split up your time? Yes, I'm going to take most of the time, Your Honor, and then we'll leave part of our time for Ms. Grover. Okay, how much time do you need? Depending on counsel, we don't want to, our arguments are very similar. We don't want to, I don't want to revert to take all the arguments that counsel's made. I anticipate only maybe a few minutes. Okay, all right, so 15 minutes apiece. One time for rebuttal? Two minutes, Your Honor. Two minutes? Okay. All right. Thank you, Judge. Before I forget, as I indicated in the previous case, our colleague, Justice Hall, will be listening to your arguments on the tape and then be joining us later on in the decision. Okay, very good. Thank you. Good morning, Your Honor. As I said, Michael Lasek. I'm here on behalf of the Plaintiff's Counsel, James Howley, the Administrator of the State of Jasmine Pool. This, of course, is the case in which the Governor Johnson Swimming Pool and Plaintiff's Sixth Recovery under several theories, trial court granted summary judgment on all of them. I'd like to focus just on our two main points. The first point we have is the sides obviously disagree about what the swimming pool regulation means, and that gets to the heart of that point. The swimming pool regulation, if the Court recalls, has three sections to it. The first one deals with weight pools, which is not us. The second deals with situations where you allow people in the pool under 16. And the third section, the third sentence in the regulation, deals with situations where you do not have lifeguards. And the defense in this case believes that they fall under the third situation because they did not have a lifeguard, and they put up a sign that said they did not have a lifeguard. The problem was that we believe that we fall under the second sentence, which is the scenario where you allow people in the pool under the age of 16 because that's what they did here. It's just a very simple little fact that should determine the outcome, at least with respect to the swimming regulation argument. As the Court's aware, Jasmine was accompanied by Mr. Ross when she came in, an adult, and that's fine. But at some point in that morning, the attendant at the pool was clearly made aware that the adult was leaving. That meant that the child was now unaccompanied by an adult, and the pool attendant, who has the authority, everybody agrees she had the authority to control that scene, allowed the children, including Jasmine, to stay in the pool. So what is Hampton? I'm sorry? What is Hampton? She's a pool attendant. Just playing in the pool? Part of our argument is that she can be regarded as a lifeguard, but we don't believe that that's critical to the legal analysis. It's not the one that I'm making now, actually, because if she's a lifeguard, then she failed to do her job completely. If she's a pool attendant, we still have the situation where under the second sense of that regulation, they allowed somebody to be in their pool without a lifeguard. Either they did that or they allowed somebody in who was incompetent. So their argument is she's only an attendant, and that's all. The reason I raise that is because she's still with her own children. She's not even dressed like a lifeguard or a pool attendant, just like someone with street clothes. So do we know if Mr. Ross even knew who she was when he asked her to watch the children? Because he's a resident there, he knew that she was the attendant for the property. He knew he wasn't the bystander in the pool. He knew that he had to go check in. I believe he said he'd seen her before, and he knew that was the person in charge of the pool. He's a tenant there. He's a tenant, that's correct. So he's obviously aware of the signage in the pool area. That's correct. And supposedly what her capacity is with regards to the pool. Correct. So when he told her to watch children, under what capacity did he ask her to watch children? The only capacity that would make sense is because you are the attendant and you're the person in charge here. But she doesn't have any obligation or responsibilities to watch the children because she's a pool attendant. No, but she does have an obligation to enforce the rules, and one of the rules is you're not supposed to be in the pool unaccompanied if you're under 16. It almost gets to be a catch-22 as you see the defense in the point of go back and forth here, but she does have a job to do. It's not to let people in that pool who are under 16, not to even be in the enclosure if they're under 16, and Jasmine was under 16. So what did she deviate from her responsibilities then? Was there a time when Ross asked her to watch the children? Actually, so it's clear. He didn't specifically say watch my children. He said I'm leaving. I'm going to go do my laundry. I don't want to miss that. That's the point where if she has a duty to manage the pool, and everybody agrees on that, there's no dispute she has a duty to follow the rules. She should have told the children not to go in the water. That's the easiest thing to do. And if she tells the children not to go in the water, we're not going to be here today. I'm getting a little confused because now what argument does that go to? Can we go back to the act or the regulations? Yes, the swimming pool regulations. Right. So the way you read this regulation is that a pool who has no lifeguards and has a sign that clearly states there's no lifeguards and you shouldn't be swimming here if you're under a certain age. But at some point in time, underage kids get in this pool. They suddenly have to have lifeguards there. Is that what you're saying? If the facility allows them there. I think there's a solid distinction there. But you're saying they allowed them when Mr. Roth left the pool. And they let her stay when they knew he was the – it's a very limited fact scenario. If this Court is going to write a decision on reversing, it doesn't have to go beyond these very limited facts where the attendant knew that the child is under 16 and knew that the monitoring adult was gone and knows that under those rules that child should not be in the enclosure. She should have left with Mr. Roth. That's a different thing. You're saying that the child should have left, not that there should have been a lifeguard there. No, we're saying that the attendant should have told the child to leave. That's correct. Under this regulation, that duty arises. Correct. And we're looking at the second sentence, which says, That's the second sentence. And our point is that at that point, they needed more than her. They needed a lifeguard. This dichotomy between the attendant and the lifeguard, I know, makes all the case arguments fuzzy. It's not a legal word, but that's what the Court's intending. The second sentence said you have to have lifeguards if you're going to let people – Okay, so we're back to this. So you're saying at the very moment that Mr. Roth left the pool, the kids were left in there, a lifeguard needed to appear. Two things had to happen. They either had to have a lifeguard there, which they did not, or they just have to tell her, you can't go in the pool. You have to do your job. And then they don't have that problem with the second sentence, because now they don't have a situation where they've allowed people to be there. Their problem is that they allowed her to be in the pool. I mean, that's implied permission when you're – I'm right in front of you, and I get into the pool, and you don't say anything. Nobody's called it to doubt. All right, so you're saying this regulation gives rise to a duty to tell the kids to get out of the pool. That's correct. One of two things. They either have to – when the adult leaves, you need – you violated a sentence to her because you need a lifeguard and you don't have one, or you need to tell the person to get out of the pool, one or the other. But we're here on a grain of emotion for some of the judges. Correct. And there's no question that she's got a lifeguard, right? I'm not going to agree with that because I believe that she's there. She's got the equipment. She isn't trained to be a lifeguard. Should she have been a lifeguard? You know, I'm – I understand my predicament. Nobody thought she – I don't believe – Mr. – actually, Mr. Ross thought she was a lifeguard. He really thought she was the lifeguard. She did not have a shirt on, as in that other – Well, where did he get that from? He thought she was a lifeguard. His comment was, I thought – I thought that she would rescue her. I think that was – he thought that he would – he thought that she would perform the duties of a lifeguard, that she would do something. And he was not out of line on that because both Hampton and Norman said she should have at least called 911. They agreed on that. She should have done something. I need to move on to my second point. Hold on. Let me interrupt this for one second because you brought to our attention the second sentence in the provision. But it's – the sentence also says allowed. So who has the authority here to allow someone under the age of 16 to be in the pool? Does Hampton have that authority? Yes. Why does she have that authority? Because she's the one – her duty is to check people into the pool and to see that they're residents. And if you recall, she specifically asked about the girls. She asked if they could swim. They're obviously under – clearly under 16. She's the one who's in charge of that pool. Nobody – no one on the other side has made that argument that she is not in charge and running that pool that day. She might not have done it well, but that's her job. She's a pool attendant. So she was vested with the authority of allowing or not allowing. Because she spoke – because everybody agrees she must enforce the rules. And the rules are you can't be in that pool if you're under 16. If she doesn't know the rules, that doesn't fall back on what her job is. That would just mean she wasn't trained, which is something that's going to come up at trial. Right. But she's the pool attendant. She has to – everybody agrees she has to enforce the rules. And that was something that died this year. The trial courts really hinged upon whether or not she was a lifeguard. The other point that we have is the same point that came up in Blankenship, and that is Mr. Ross reasonably thought that this person would do something to help. Whether she was a lifeguard or an attendant, that Hampton would do something to assist the children in some way. And everybody, both Norman and Hampton, agree that she should at least have called 9-1-1. That's just voluntary. Voluntary assumption of a duty. Okay. And from Mr. Ross' perspective, he walks through the gate, he's checked in by somebody, who's sitting right at the water with the cell, with the emergency phone on one side and the life-saving equipment on the other side, and says, I'm leaving the pool. So that's when you say the voluntary undertaking started to take place. Yes. When Mr. Ross left the pool? Yes. When he informed her that he left the pool. If he had just walked away without saying anything to anybody, I don't know that I would have to have a different position. But the key here is that the lifeguard acknowledged, I knew he was gone, I knew the children were alone, and even Norman, the manager said, the attendant should have known that Mr. Ross was gone. And he was out of sight. There was a hint in the defense briefs that he could see, but he testified that where he was in the laundry room, he could not see in the deep end of the pool, which is where the problem arose, unfortunately. But do we ever have an agreement or an assent on her part to say that I will take the sign? That's her job duty. Her job duty is to, Norman and Hampton both agreed she should at least have called. They both agreed she should have called. But this is an implied assumption that she's going to take the sign. That she will do something. Right. There was never an agreement on her part. No specific agreement. Right. That she didn't sign anything. No, she didn't call anybody either. But going back, he also said, the accusation, Norman said that BG should have trained her. Right. So if she didn't do it, it still falls upon them, if she did know what her duties were, that it's not on, my point is, it's not unreasonable for somebody like Mr. Ross to say, why else is that person there? They're just going to close their eyes? If you don't dive in the pool and pull them out, just call 911. Just go to the office, which is literally that far away. That gentleman, Mr. Ray, came on saber like that. But she did attempt to try to save the child. She went and she did. She tried to go over. Yes, she did. She made an effort. Did she, to some regard, suffer for her voluntary overtaking here? Because, I mean, she did attempt to try to save him. Then the question is whether or not the attempt was a reasonable attempt, when the reasonable attempt would be, call 911 or get some help if you can't swim. And some of this goes back to her training. It's not just Hampton they focus on here. The allegations were, you know, that they didn't train this person to do what they're supposed to do. So it's potentially a situation like Longnecker, where even if she didn't know what she was supposed to do. So she wasn't even hired to be a lieutenant? No, she was not. But she'd been out there before. Okay. And they knew she'd been out there before. By they I mean J.R.K. Knew she'd been out there before. Knew she'd been out there before with her children. So who had the responsibility of vetting her? Longnecker said B.G. should have trained her. I think B.G. said J.R.K. said, well, that's something that wasn't hashed out. They just agreed that somebody should have trained her. I'd like to say it stands to reason, if I hire somebody to do a job, I should train them. Especially if it's a job where you're sitting by the pool. This isn't some kind of a huge operation where everything got lost in the shuffle. This was a small pool. And I think the circumstances themselves were being somebody walking through that door to think, whatever that is, whatever the job is, lifeguard, attendant, they're right by the pool. When I run this past other warehouses I do with any case of mine, I say, Norman, what do you expect the pool attendant to do? Because they think of a pool attendant as somebody over in the corner with towels. And that was not what they did here. If that's what they had here, we would not be here. They put the person right at the pool, put her with the accordance of somebody who would help. Her job was to follow the rules. And, Norman, you have the best of luck. You should at least have called 911. All right. And then what about the issue regarding the children? She was there with her own children. I mean, did somebody give her permission to be there with her children? Because it appeared from the record that they were part of the distraction as well, because she was carrying one while she was trying to help the young lady in the pool. Yeah, the attendant checked all four of them in. I mean, nobody came in afterwards and created a commotion. The evidence is that Ross came in and brought in the three people. She knew there were three people there. I think Justice Freitas is talking about her own children. Yeah, Hampton's children. I'm talking about Hampton's children. Oh, her two children. I misunderstood. Her two children. Yeah. The evidence was that she had been there once before with her two children, and nobody disciplined her, thus leading her apparently to believe that she could do this. Again, it goes back to BG and JRK. And Hampton. I don't know where the flaw lies there with some place, but it doesn't lie on our side, and it should not change the duty. It might change who violated the duty, but between Hampton and BG and JRK, the court would have to rule that they put a person there in these circumstances, and it was unreasonable for Mr. Ross to think that she might help. What she had to do is something we'd have to quarrel with at trial. But she should do something. She's supposed to be. When Arlington Heights has a code provision that says you need an attendant there, to say that all I had to do was have her there I think seems unreasonable. I can't find a case that says it's so, but at some point I can only fall back in common sense. And that leads me back to what Mr. Ross said. I would never have left her there if I had known that that woman could swim. In other words, he was clearly looking for her to help in some way. And it was so easy to do, and she didn't. Tell me about the Arlington Heights ordinance. How are you using that? How does that come into our hands? It either creates a duty or it's evidence of the violation of the standard of care on her part because the code requires an attendant to be there. And the argument on the other side is that she's only there for sanitation. But the Arlington ordinance doesn't say just for sanitation. It says for a pool operation. And the authorizing statute that sets up the agency that sets these things, within it discusses all kinds of things that might be done, included in there are signs warning children to stay out of the pool. So the point is quite simply that Arlington wanted an attendant there, and that would imply that they wanted the attendant to do something other than just be there. And that do something would be to assist in whatever way is appropriate. If you can't dive in, you can't dive in. But at least you should make the phone call. You should reach for the stick. You should just go to your boss, who's, I say, feet away, and just say somebody's in trouble instead of what happened. And the signage at the pool, who's that intended for? Pool users. And it told Mr. Ross, actually I think he said, he wasn't sure there was signs there, but it's clear from the police reports there were signs there. And our point goes back to my first point. The signs said you're not supposed to be here if you're under 18, I think they said. But going back to Ross, you had a sign there, and you make a statement to someone who's there who doesn't respond affirmatively one way or another. You just assume they're going to take on a duty, and then you leave. That's correct. But your assumption is based upon the position that J.R.K. put her in by the poolside that would lead a reasonable person to believe that she had the authority to do something. And, in fact, that's a right presumption on Mr. Ross's part because her authority is to control the operation of the pool. Did she have a little sign that said lifeguard? No. Did she sit up on her own? No, no. She was not in a lifeguard chair. She wasn't in a lifeguard equipment. But our point is, it's not that he was depending upon her to be a lifeguard. He was depending upon her to provide assistance. And an attendant can provide assistance just as simply as a lifeguard could. Maybe not to the same degree, but it's there. And are we supposed to be looking at him? I'm assuming this is the assumption of the duty of care, your argument. Are we supposed to be looking to him as to what he relied on? What a reasonable person in his shoes would rely upon. What a reasonable person... But he was the caretaker. Correct. He wasn't the person who was injured. Correct. And that would be 324A. You're saying a third person. Yes. Correct. The benefit was for the benefit of the third person, which was Jasmine Poole. And that is almost identical to the care, to the duty that was found in the Barnett case. The Barnett did find that there was a voluntary duty. Under circumstances that aren't all that different, except the person there was an adult. And they still found a voluntary duty. I don't understand why that case can be distinguished from this case. I'm happy to have defense counsel try to do that. The discussion in Barnett sometimes is fuzzy, but the bottom line is, they're doing a voluntary duty to an adult. Because they misled them into thinking people were there. People would help them. The key is they misled somebody into thinking you would get help. I'm just going to ask further questions. I know I've used my time. Thank you for your attention. All right. Thank you. May I please the Court, Don Sampson, on behalf of the BG defendants. If you could speak up a little bit louder. Yes, sir. That's good for recording purposes. I agree with Mr. Rassak on one point. And that is that the purpose of the signs is for the people using the pool. And that clued to Mr. Ross. And he could read the sign just as well as anyone and know that children under the age of 16 or 18, in the case of this sign, were to be accompanied by an adult. And then he could take action accordingly. That's what he did. He left. But that's the purpose of the signs. Let me address the regulatory argument, if I could. And I think to address that regulatory argument, we have to start with the common law. I don't want to back up too far here. But I say that because under the Offred v. Shelton case and the J.P. Morgan case that we cited in the brief, the Supreme Court has said that you can't construe a statute or a regulation in derogation of the common law unless it states so specifically and expressly in the statute or the regulation. So we have to take a quick look to see what the common law would apply here. And the common law doctrine that's applicable is the open and obvious doctrine. And what that doctrine says is that where the danger involved is open and obvious. And there's no duty on the part of the owner or operator of the body of water in question to protect against the risks associated with that water, including drowning. And if there is no duty, then there is no liability. So that's where we start. So the big picture question here, so far as the regulation is concerned, is whether the regulation relied upon by Mr. Rathsack changes the rule of the common law and express terms such that there is no longer, such that the open and obvious doctrine does not apply or is altered in some way. And the answer to that question is yes, it does change the common law to the extent that it requires the owner or operator to post a sign. To post a sign if there's no lifeguard on duty and if kids under the age of 16, according to the regulation, are permitted in without being accompanied by an adult. That's it. That's the duty. And there's no issue there. There's no question here. But that requisite sign was posted. No other duty is explicitly imposed upon the owner or operator of the pool. And under the Bush and Harris case, if there is no duty, then there is no liability. Now all of Mr. Rathsack's arguments have to do with what he would like to have this regulation say or inferences or implications that he makes from the language of the ordinance. He says, for example, that if the adult accompanying the children into the pool steps away for a few minutes, then there must be a lifeguard present or the pool attendant has the duty to take the kids out of the pool. And the regulation could have said that. What about the issue with regards to permitting someone to be in the pool area? Mr. Rathsack has argued that the pool attendant, Hampton here, allowed them to be in the pool area. Allowed Mr. Rathsack to be in the pool area? Allowed the children to be in the pool area? Because they were under 16. Yeah. They came in. At the time that they came in, Ms. Hampton assured that they were accompanied by the adult. And then he stepped away. And their position here is that under this regulation, Hampton had the obligation to pull the kids out of the pool. Or the authority. Well, I don't know if she had the authority or not. When she had the authority, if she's there as a pool attendant, regardless of what her title is, she's working for the building or the company, whichever one is responsible to have her there in the first place, she's there, as they argue, as someone who has the authority to say, you're under 16, you don't belong in the pool. I'm going to disagree with your honor slightly, only to say that I think that Okay. Let me disagree with Mr. Rathsack. I feel much more comfortable disagreeing with him. And I would say that the real question here is not authority. The real question here is duty. Did she have the duty to pull the kids out of the pool? And the answer is no. There's nothing in the regulation that says that. It could have said that. It could have said that at no time are kids allowed in the pool when the adult steps away for a couple of minutes. The regulation doesn't say that. And you can't imply or infer a duty based upon the language of this regulation. All the regulation says, when there's no lifeguards present, you post a sign. And that's all the regulation says. And it says you post a sign in anticipation of the fact that the adult accompanying the kids will read that sign and act accordingly. And you can't infer or imply anything more than that out of this regulation. It could have been phrased differently. It could have been phrased in the way that Mr. Rathsack would like. But it was phrased in terms of what the sign must say. And the sign here said, no lifeguard in duty and kids under the age of 18 must be accompanied by an adult. So, no duty under the regulation. Justice Rochefort asked about the Arlington Heights Ordinance. Can you talk to me about that? I'm not quite sure how that plays. Well, I'm not sure quite how it plays either. Because the ordinance itself requires that a pool attendant, quote, enforce all applicable regulations pertaining to minimum sanitary requirements and operation of swimming pools, quote, unquote. Mr. Rathsack, being the very good attorney that he is, he focuses on the word operation. And he says that the word operation entails all sorts of life-saving rescue operations. But that's not what this ordinance says. And if the drafters of this ordinance had intended life-saving rescue operations, I've got to think that they would have said something to that effect in this ordinance. The ordinance section itself, section 19-402, is placed in the Arlington Heights Code in chapter 19. And chapter 19 is entitled Health and Sanitation. So that might give us some clues to what's intended here. In the previous section, previously one relied upon by Mr. Rathsack, section 19-401, is entitled Adoption of Minimum Sanitary Requirements for the Design and Operation of Swimming Pools. Now, the word operation there clearly refers to sanitary requirements. And there's no reason why that meaning should not be attributed to the word operations in the very next section of the code, section 19-402. The ordinance, moreover, talks about the enforcement of all applicable regulations. There aren't any regulations set forth in the Arlington Heights Code. And if perchance this might mean a reference to the regulations promulgated under the Swimming Facilities Act that we just talked about, the State Swimming Facilities Act, I suggest, Your Honors, that's a stretch. But if that's the meaning here, then the only requirement under the Swimming Facilities Act and the regulations, what we just talked about, the posting of a sign. So the ordinance itself doesn't add anything here to the overall analysis. It takes us back to the Swimming Facilities Act. I think you made an argument, too, that there's no indication that it's creating a common law action or some type of duty that's applicable here. That's quite right, Rhonda. There is no common law requirement here. We fall back to the open and obvious doctrine. And the open and obvious doctrine says that the defendants here have no duty to protect against the risk associated with this body of water. But doesn't the code also say that there's a safety procedure here in regards to the safety procedure that the individual in charge or responsible or obligated pool attendant should enforce the rules and regulations of the pool area, which is what occurred here in terms of her not enforcing the regulations? Well, are you talking about the city ordinance? Right, in 19-402. It refers to operations. No, but I'm referring to 19-402 of the code. Yes. Which says that a pool attendant shall be present at any time and an outdoor swimming pool is in use. The attendant shall enforce all applicable regulations pertaining to safety requirements in operating a swimming pool. Yes, we were just talking about that. Right. And I'm saying that the code itself doesn't have any regulations in it. And if the code, you know, it says enforce all regulations. So that, again, takes us back to perhaps we have in mind the regulations. I mean, as I've said, there's no regulations under this code here. Okay. So maybe that takes us back to the regulations under the State Swimming Facilities Act, and we've just talked about that. What's the sign then? Pardon me? What's the sign? What is the sign? Isn't that part of the parcel of operation of the swimming pool? You have a sign up to let your residents know, all right, these are the rules. These are the regulations. Right. Thanks. So isn't that part of her responsibility to say you can't be in here if you're under 16? She fulfilled or the defendants here fulfilled whatever duty they had under the state regulation by posting the sign. By posting the sign. That is the duty imposed by that regulation. Well, what's her responsibility as to the sign? To make sure that the sign is up. And was that done here? Of course. When? No. The sign was there. I'm not disputing that the sign was there. What I'm asking is, her responsibility was to enforce what was written on the sign. No, sir. I disagree with that. Okay. Her responsibility. Well, I'm supposed to be having the sign up. Yeah. For her to be there to tell people you can't. Isn't that her backup? I mean, she says, you're under 16, you don't belong in this pool. So you leave the sign. Leave the sign and act accordingly. And that's what Mr. Ross did. He read the sign, or he knew the sign. I can't swear to the fact that he read it. But he knew or should have seen the sign and he acted accordingly by leaving. That's my point is this. What's her relationship, the pool attendant's relationship to the sign? To make sure the sign is there. Just to make sure it's there? That's all that the regulation requires. It says if there's no lifeguard on duty, you post a sign. And the sign was posted. And you can't infer or imply any additional obligation apart from that, Your Honor. As I said, the regulation could have been written in a different fashion. But it wasn't. It was written in the context of what the sign must say. The sign said what it was required to say. And it's written in the context of the open and obvious. Absolutely. What landowner's responsibilities are. Yes, Your Honor. That's absolutely correct. Can we go to the, I'm calling it the wrong thing. Let's talk about that for a minute. Yeah, I agree, Your Honor. The argument here is that the defendants voluntarily assumed the role of a lifeguard because Mr. Ross, the adult that accompanied the kids into the pool area, relied upon his assumption that Ms. Hampton was a lifeguard. That's the argument. Now, the argument falls apart at the outset. And it falls apart at the outset because Ms. Hampton was posted next to the pool because, as Mr. Rassak has ably argued, the Arlington Heights Code required that the apartment complex post an attendant next to the pool. And if her being posted next to the pool was compelled by law, then it was not a voluntary act. So this whole, you know, she was posted next to the pool, so you can't assume that when there's a law that requires her to be posted next to the pool. But apart from that, there are at least three conditions that must be met here for the type of voluntary assumption theory to take hold. And we set these forth in the brief. One is that there must be a deception or misrepresentation of some kind by the defendant. Second, the plaintiff or the person acting on behalf of the plaintiff, in this case Mr. Ross, must reasonably rely upon that deception or misrepresentation. And third, the person relying must not have the ability to find out the true facts for his own. Now, I mention those because I do set them forth in our brief, and I don't believe that Mr. Rassak contests those requirements in his reply brief. So I think they fairly state Illinois law on this subject. And the fact of the matter is that none of these requirements were met. First of all, Ms. Hampton did not hold herself out as a lifeguard, as Your Honor, Justice Gray has pointed out. She wasn't dressed like a lifeguard. She didn't have a sign that said lifeguard. She was a pool attendant posted there because she was required to be there by virtue of the Arlington Heights ordinance. Second, Mr. Ross never asked her, are you a lifeguard? Are you someone who can assist in the case of an emergency? Now, Mr. Rassak says in his reply brief, he didn't have to ask. I suggest, Your Honor, he did have to ask. If he's going to leave these kids, I mean, he was in charge of the kids. He was going to leave them in the charge of someone else, a complete stranger. And I suggest, Your Honor, he did have the obligation at least to make the inquiry. Are you a lifeguard? Are you capable of assisting? He didn't do that. In addition, there were signs posted around the pool saying no lifeguard on duty. So in a sense, Mr. Rassak is correct. He didn't have to ask. Mr. Ross didn't have to ask. He could have just read the signs and known from reading the signs there is no lifeguard here. And that's all the more reason he was under an obligation to inquiry for his assumption to be reasonable. There was also another sign that says you swim at your own risk. And another sign that said that kids under the age of 18 must be accompanied by an adult. All of those were indications to him that he couldn't just rely upon the presence of this woman to take charge and take care of the kids or babysit the kids while he went off to do his laundry. So his reliance here was clearly unreasonable and there was no voluntary assumption. What about the fact that on her own she decided to voluntarily undertake trying to save the young girl in the pool? Aside from whether or not she had a duty under the law in terms of regulations, statutory or otherwise, she still did take an undertaking here, voluntarily attempted to try to save the young girl. Well, there's different kinds of voluntary undertakings. And Section 323 of the restatement talks about at least a couple of them. The form of voluntary undertaking that Mr. Ross had alluded to in his brief has to do with reliance upon another's to take action. Another form of voluntary undertaking is when you actually undertake action and you do so negligently, such as to increase the harm to a victim. There's never been an argument here that anything that Ms. Hampton did increased the injury to the victim in excess of what it would have been had she done nothing. And what about the delay in time of calling 911? I mean, she's on the cell phone talking to her grandmother or mother or whoever and she's walking around the pool with a child in her arm and she sees the girl down at the bottom of the pool and she gets this thing that comes in effective in terms of trying to help her out. And then minutes later, then she decides, oh, I better tell somebody so they can call 911. I would like to think that if it had been me in her place, I would have acted differently. I would like to think that. But the question here is duty. Did she have a duty to do something other than what she actually did? Well, she started to voluntarily undertake trying to save the young girl. She took certain steps which did not in any way interfere or cause injury to this victim. And so in that kind of voluntary undertaking, it didn't take hold. If she had somehow injured the victim here and made her injuries worse than what they would already have been or caused the drowning in some way, then there would be a different argument. But that argument has never been made. So the fact that she's down at the bottom of the pool doesn't make a difference, right? The fact that she's down at the bottom. And her delay in time in terms of calling 911, that doesn't make a difference. It makes no difference in terms of any duty that she had, Your Honor. She was under no duty to take any effective action. And in the absence of a duty, there is no liability. And you have to ask, what is the source of the duty? It didn't come from the regulation. It didn't come from the common law. It didn't come from the Arlington Heights Ordinance. There was no duty here. The common law, open and obvious doctrine, prevails. And again, it was never argued, was it, by the plaintiff that that was? I mean, you can correct me, but when he stepped up, he was talking about third person. He was talking about the reliance on a third person type of voluntary assumption. No other type of voluntary assumption was put forward by the plaintiff here. That's absolutely correct. If you have no further questions, I'll turn things over to my colleague, Ms. Polk. Thank you. Thank you. May I please report, Betsy Grove, on behalf of the JRK defendants and Nicole Norman, property manager by title of the apartment complex at issue. I'm not going to regurgitate or spend any time talking about the arguments that Counsel for BG Staffing and Ms. Hampton already addressed. I just wanted to raise a couple of points that I think have been glossed over or that might need a little clarification. The first is the ordinance that we're talking about that requires either a lifeguard or a sign in the middle of a lifeguard does not in any way talk about whether or not an attendant is necessary. That regulation is silent about an attendant being present. The only reason that the attendant was present was because of the Arlington Heights Municipal Ordinance, which required an attendant for sanitary reason and operation of the pools. Your Honor, I believe, I can't recall which of you, I think both at some point, asked how that ordinance played in. The ordinance does not give rise to a duty here. Wait, so I didn't just refer to my nose to call, right? I'm talking right now about the Village of Arlington Heights Municipal Ordinance. That ordinance, which talked about health and sanitation, there are specific provisions in the Illinois Swimming Facilities Act that talk about sanitation and operation. Under none of those categories is there anything dealing with personnel or lifeguards or attendants. That is all under a separate category. What is required under the Swimming Facilities Act, the Illinois Code, is that the pool needs to be cleaned from debris, that the area surrounding the pool should be clear from debris, the pool benches or pool chairs, lounge chairs, things of that nature need to be a certain distance away to keep the pool safe and clean. That is what the ordinance is referring to, I believe, when they reference minimum sanitary and operation of the pool. Nothing to do with personnel. Further, the Village of Arlington Heights Ordinance did not require a lifeguard. If they had required a lifeguard, they would have so stated. They would have said that it was there for lifesaving measures. They would have used any words that would have implied that any attendant had those obligations to perform lifesaving duties. It did not. It talked about sanitary obligations and sanitary issues and health issues in, excuse me, operation, which again is not what personnel falls under. Why the regulation is, I'm going now back to the Swimming Facility Code, why it's important that it does not reference an attendant is because of something Mr. Estat said at the very beginning. He said that the regulation means that as soon as the adult guardian leaves or walks away, however momentarily he does so, in their brief they talk about the momentary leave. Mr. Estat was gone for three minutes. That's what they allege in their statement of facts. He stepped away to get his laundry and returned. We have the video. We can see him return three minutes after leaving. Mr. Estat said at that point you need a lifeguard or an attendant needs to kick them out of the pool. That can't possibly mean what the regulation intended or else they would have required an attendant to be there. Who was to police that or who was to enforce that if an attendant was not present? That's not what the Illinois Act requires. The Swimming Facilities Act requires either a lifeguard or a sign alerting the patrons that there is no lifeguard on duty. That was met. There is no dispute that those signs were amply available on the pool. There were multiple signs and they were prominently placed. What was her function? Her function was to make sure that the people that were entering the pool were residents, that they were not trespassers, and she also needed to make sure that the area was clean, free from debris, and making sure that the people that entered the area were going to stay. I don't think she had the obligation to make sure that everyone stayed, but she did have the obligation to make sure that everyone who entered showed ID and showed that they were a resident of the facility. Mr. Ross signed his lease agreements abiding by those guidelines. He knew there was going to be no lifeguard on duty. So any, you know, consulate made the argument that he relied on Ms. Hampton to be a lifeguard. There's no evidence of that in this record, none. And, in fact, he signed multiple documents, not just in his lease agreement, but also in addendum to his lease agreement about the fact that this pool was not going to be governed or oversaw by any type of lifeguard capable of providing any rescue operations. So the management company that ran the building, they just wanted her to make sure that she didn't allow trespassers onto the pool area and maintain the pool area, keep it clear for debris. And that was it. And, frankly, the reason she was there was simply because the village of Arlington Heights required her to be there. Just, and I think there was a couple questions asked about training and stuff. JRK owned the property for one month. They had kept in place procedures that had been going on over the summer by the prior property owners. So they just kept those procedures in place, adopted those same rules. And those guide, the job description talks about cleaning the area, making it free from debris, doing any water testing or assisting with water testing when the pool operator needs to check, you know, for water sampling to check pouring levels, stuff like that. She was supposed to assist with those obligations. But her main function was to make sure that there were no trespassers and that everyone who entered the pool was at least a resident of the facility. Lastly, Mr. Resnick brought up the Barnett case, which I would encourage the court, if they have not already, to review, because the Barnett case deals with almost the exact scenario. And they do talk about the fact that an owner and operator of a pool is not required to monitor or police whether minors are left in the pool enclosure unattended if they are brought there by a guardian. If so, that would require every time that someone brings children to a pool that a lifeguard should somehow appear, even if an attendant wasn't there. A lifeguard should appear whenever a guardian goes to the restroom, when they go grab a beach ball that's gone over the fence momentarily, when they leave for any moment of time. If you believe what counsel would like you to believe the statute reads, that would require a lifeguard to somehow be present any time a guardian steps away, as he put it, even momentarily. If you don't have any other questions, I think I'm done. Thank you. Thank you. A minor point to begin. The evidence was that JIK used attendants like this at all their pools. Nobody said we only had an attendant here because I was required to do it. It was part of the process of running their facilities across the country. The court asked counsel what the attendant's duties were. At page 7 of our brief, and I presume the citations are right, she was to make sure anyone under 18 was accompanied by an adult. She was to enforce pool rules. We've got three citations there. The scope of her duties were broad enough to cover what she should have done here. She also agreed she should have called 911. That's her job. She said she was to call 911 if she saw someone drowning. That's set out at page 7. She didn't do that. As to whether she said something to Mr. Ross or not, under the cases that are brought either under 924, I'm sorry, 324 or 324A of the restatement, they're close, they're just slightly dissimilar. No case that I'm aware of requires that the person who should have done something needs to affirmatively say, I accept that duty. The question is not whether they say, I accept the duty, but whether the person in Mr. Ross's shoes under these circumstances might reasonably believe that that person would, in fact, do something. And the irony here is she agreed I should have done something. So the very thing that Mr. Ross thought she should do, which was to help, she said I should have called, so it's normal to say she should have called. I mean, unless the court has further questions, we've obviously explored everything. So are you arguing a voluntary undertaking that, you know, increased the injury or was owed directly to the child? There's the point. It wasn't when we did this down below, the arguments made down below in the trial court were tumbled together, and I understand that. But we did cite, we cited all the sections of the statement. There is the possibility here that Hampton's conduct delayed other people from doing something. Nobody challenged that down below, so it wasn't explored further. Our primary point would be that Mr. Ross relied upon her, and 324A talks about if I rely upon some person to carry out my duty to a third person. And that is the key point here. I don't want to wave it at you, but that strikes me as being the eyecock of the law. Unless the court has further questions, we thank you for your attention. Thank you. Thank you. Thank you, counsel, for a well-armed case, a very interesting case, and we will take it under advisement. Thank you very much.